# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| The Cordish Companies, Inc., ) | |
| ) | |
| and ) | |
| ) | |
| Lounge KC, LLC, d/b/a Mosaic Lounge, ) | |
| ) | |
| and ) | |
| ) | |
| Kansas City Live Block 126 ) | Case No. _____ |
|    Entertainment, LLC, ) | |
| ) | |
|                 Plaintiffs, ) | |
| ) | Jury Trial Demanded |
| v. ) | |
| ) | |
| Dickens Law LLC, ) | |
|    SERVE AT: ) | |
|    10975 Grandview Street ) | |
|    Building 27, Suite 190 ) | |
|    Overland Park, KS  66210 ) | |
| ) | |
| and ) | |
| ) | |
| Linda Dickens, ) | |
|    SERVE AT: ) | |
|    10975 Grandview Street ) | |
|    Building 27, Suite 190 ) | |
|    Overland Park, KS  66210 ) | |
| ) | |
| and ) | |
| ) | |
| Austin Johnston, ) | |
|    SERVE AT: ) | |
|    10975 Grandview Street ) | |
|    Building 27, Suite 190 ) | |
|    Overland Park, KS  66210 ) | |
| ) | |
|                 Defendants. ) | |

## **COMPLAINT**

Plaintiffs state and allege the following as a cause of action against Defendants.

## Parties

1. Plaintiff The Cordish Companies, Inc. ("Cordish") is a Maryland corporation.

2. Plaintiff Lounge KC, LLC, d/b/a Mosaic Lounge ("Lounge") is a Missouri limited liability company; Lounge operates the "Mosaic Lounge" located in the "KC Live!" portion of the District.

3. Plaintiff Kansas City Live Block 126 Entertainment, LLC ("Block 126") is a Maryland limited liability company; Block 126 owns the land and is the Landlord for the Kansas City Live portion of the Kansas City Power & Light District ("the District").

4. Defendant Dickens Law LLC ("Law Firm") is, on information and belief, a Kansas limited liability company with its principal place of business in Johnson County, Kansas; Law Firm can be served at 10975 Grandview Street, Building 27, Suite 190, Overland Park, KS 66210.

5. Defendant Linda Dickens ("Dickens") is, on information and belief, a resident of Johnson County, Kansas, an attorney licensed in Kansas and Missouri, and an employee of Law Firm; Dickens can be served at 10975 Grandview Street, Building 27, Suite 190, Overland Park, KS 66210.

6. Defendant Austin Johnston ("Johnston") is, on information and belief, a resident of Johnson County, Kansas, an attorney licensed in Missouri, and an employee of Law Firm; Johnston can be served at 10975 Grandview Street, Building 27, Suite 190, Overland Park, KS 66210.

## Jurisdiction and Venue

7. Some of the claims stated in this Complaint are brought pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.;

accordingly, pursuant to 28 U.S.C. § 1331, this Court has original subject matter jurisdiction over the RICO claims stated herein.

8. The remainder of the claims stated in this Complaint are brought pursuant to Kansas state law and are so related to the RICO claims that they form part of the same case or controversy; accordingly, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the Kansas state law claims stated herein.

9. A substantial part of the events giving rise to the claims stated herein occurred in Johnson County, Kansas; accordingly, pursuant to 28 U.S.C. § 1391, venue is proper in this judicial district.

**Defendants' Attempts to Obtain Money from Plaintiffs Through the Wrongful Use of Fear of Economic Harm**

10. On December 10, 2013, Defendants sent Lounge a letter via electronic mail that falsely accused Lounge of wrongfully terminating Defendants' client, Glen Cusimano ("Cusimano"), from his previous employment with Lounge (the letter is attached to this Complaint as *Exhibit A*).

11. Defendants' December 10th letter also detailed numerous false statements about Cordish, Lounge, and others; these false statements included the following:

   a. "[Cusimano's] superiors . . . ordered him to employ a 'rabbit.' The rabbit was a Caucasian male who would be asked to start fights with groups of African American patrons in order to get them kicked out of the club [Mosaic Lounge] and/or District."

   b. "As soon as the altercation started, security would move in and eject the participants from the District, effective for one year."

      c. "[Cusimano] personally observed Cordish's pattern and practice of provoking and harassing African American patrons waiting in line outside the club [Mosaic Lounge], which harassment would result in the ejectment from the District for one year of those provoked."

12. In the December 10th letter, Defendants identified Tom Alexitch ("Alexitch") as one of the individuals allegedly hired by Cusimano to start fights, and Defendants attached to the letter a document purporting to be an affidavit signed by Alexitch on December 6, 2013 (the affidavit is contained in *Exhibit B*).

13. The purported affidavit of Alexitch also contains numerous false statements about Cordish, Lounge, and others; these false statements included the following:

      a. Cusimano, acting as the general manager of Mosaic Lounge and on direction from his superiors, hired Alexitch to "start altercations with certain groups of people" to get them "kicked out of the club."

      b. "[Cusimano's] superiors referred to me as a 'rabbit,' in reference to my Caucasian race."

      c. "I [Alexitch] would always start fights within full view of security to ensure that security would respond quickly and so no one would get hurt."

14. In the December 10th letter, Defendants threatened to "move forward on all fronts" to "publicly bring to light" the false allegations described in the letter—actions that would damage Plaintiffs business reputations—unless Plaintiffs agreed to "a resolution" to prevent it.

15. To give an example of the injury to business reputation and other economic harm that would result if Plaintiffs did not give in to Defendants' demands, Defendants rhetorically

4

asked in the December 10th letter, "Would the Kansas City Chiefs want to continue utilizing the District for team events if insidious discrimination were brought to light?"

16. On December 30, 2013, a representative of Plaintiffs, Robert C. Fowler, Esquire, met with Dickens, Johnston, and Cusimano at Law Firm's office to explain to Defendants why their allegations were false.

17. Fowler explained that the District's third-party security provider creates an incident report when a fight and ejection occurs. Fowler explained that, contrary to the false and malicious allegations of the Affidavit and Dickens' letter, no incident reports exist from the summers of 2012 and 2013 regarding Alexitch being in a fight at or near Mosaic Lounge.

18. Fowler further explained that ejections, including any ejections "effective one year" as alleged by Alexitch and Defendants, are recorded and included in daily reports prepared by the District's third-party security provider; and the ejection reports do not support Defendants' false and malicious allegations.

19. In response to Fowler's explanation of why Alexitch's allegations in the affidavit were false, Johnston admitted to Fowler that "we [Defendants] went too far with the affidavit." In fact, Fowler's reporting of the true facts caused Defendants to realize that the allegations or story was easily disproved, necessitating the invention by Defendants of new false allegations that they hoped would be harder to disprove.

20. During the December 30th meeting, Fowler and Defendants also discussed whether Cusimano and Alexitch had a prior relationship; Defendants insisted to Fowler that Cusimano denied having a relationship with Alexitch prior to the alleged incidents at Mosaic Lounge; Fowler informed Defendants that in fact Alexitch (also a convicted felon) appeared to

5

testify as a witness at the hearing for Cusimano's fraud conviction in 2005 and subsequent jail sentencing.

21.     Each time Fowler proved to Defendants that the allegations being made against Plaintiffs were false, Defendants would change their story to attempt to make up new "facts" that might be harder to disprove.  Defendants continued to manufacture false allegations. Defendants continued to fit the record, change their story, and to falsely accuse Plaintiffs so as to embarrass and economically injure Plaintiffs.  Defendants' inability to stick with any one story is evidence of the falsity of the allegations against Plaintiffs and of the intent of the Defendants to harm the Plaintiffs.

22.     At the conclusion of the December 30th meeting, despite knowing that Cusimano's and Alexitch's allegations were false, Defendants told Fowler that they would "have to go public" with the allegations against Plaintiffs, causing bad publicity for Plaintiffs and harming Plaintiffs' business reputations, unless Plaintiffs agreed to pay settlement money.

23.     Fowler and Dickens had subsequent conversations via phone during January and February 2014; each time, Dickens reiterated the threat to publicly disclose the false allegations about Plaintiffs unless Plaintiffs agreed to pay money to Defendants.  Her threats to publicly embarrass Plaintiffs and economically injure Plaintiffs rather than the reality of her ever-changing "story" was her dominant theme of the attempt to extort money from Plaintiffs.

24.     Plaintiffs ultimately refused to give in to Defendants' demands.

### Defendants Make Good on Their Threats to Harm Plaintiffs' Business Reputations in Public

25.     When Plaintiffs refused to give in to Defendants' demands, Defendants formed an intentional plan or scheme to defraud the public about Plaintiffs business reputation, by

6

spreading their false allegations publicly, thereby exposing Plaintiffs to public hatred, contempt, or ridicule and/or depriving Plaintiffs of public confidence in their businesses.

26. On March 6, 2014, speaking with one or more news reporters from local television stations KCTV and/or KSHB at Law Firm's office in Johnson County, Kansas, Dickens made statements to those reporters that included many of Defendants' false allegations about Plaintiffs, including:

   a. "[Cusimano] was instructed by his superiors to employ a rabbit."

   b. "[Cusimano] was told that if you can't do this [employ a rabbit], we'll find somebody who can."

27. On March 6, 2014, speaking with one or more news reporters from local newspaper The Kansas City Star at/from Law Firm's office in Johnson County, Kansas, and/or at/from other locations in the Kansas City area, Dickens made statements to those reporters that included many of Defendants' false allegations about Plaintiffs, including: "Cordish set up their [sic] own 'rabbit' incident against [Cusimano] to trump up a reason to fire him."

28. On March 6, 2014, speaking with one or more news reporters from local television station Fox 4 KC at/from Law Firm's office in Johnson County, Kansas, and/or at/from other locations in the Kansas City area, Dickens made statements to those reporters that included many of Defendants' false allegations about Plaintiffs, including:

   a. "[Cusimano] lost his job because the owners of the district wanted to lighten it up."

   b. "[Cusimano] was setup for a fight, and then he was blamed for the fight."

29. In fact, well known to Defendants, Cusimano was terminated because the Kansas City Police Department charged Cusimano with assaulting a Defendant's Mosaic customer. On the basis of that undisputed fact, Mosaic had no choice but to dismiss Cusimano.

30. On March 6, 2014, speaking with one or more radio hosts from local radio station KMBZ from Law Firm's office in Johnson County, Kansas, or from another location in the Kansas City area, Dickens made statements on the air to those radio hosts that included many of Defendants' false allegations about Plaintiffs.

31. Plaintiffs believe additional defamatory (slanderous) statements made by Defendants about Plaintiffs to news reporters on and since March 6, 2014, will be revealed during the course of discovery in this matter.

32. Dickens made these and other false and malicious statements to news reporters and others, some of which from Law Firm's office, for the purpose of executing Defendants' intentional plan or scheme to defraud the public about Plaintiffs business reputation, exposing Plaintiffs to public hatred, contempt, or ridicule and/or depriving Plaintiffs of public confidence in their businesses.

33. Dickens made these and other false and malicious statements to news reporters and others, with reasonable foreseeability that those news reporters would subsequently publish news reports containing the false statements via wire, radio, or television communications in at least the Kansas City metropolitan area.

34. After Dickens made these false statements to news reporters on March 6, 2014, those news reporters did in fact publish news reports containing the false statements via wire, radio, and television communications in the Kansas City metropolitan area and beyond.

35. These false statements by Dickens have resulted in actual harm to Plaintiffs' business reputations.

### **Defendants Attempt to Tamper With a Witness**

36. Andrew Coleman ("Coleman") is a former employee of Angels Rock Bar in the District who now lives in Houston, Texas.

37. On March 19, 2014, Dickens contacted Coleman in Texas via phone from Law Firm's office and spoke to him in a threatening tone. Dickens threatened to sue Coleman unless Coleman assisted Defendants in a class action lawsuit against Plaintiffs. These threats continued despite Coleman's repeated assertions that he did not believe her story and allegations and observed no such behavior during his many years of employment in the District. Dickens told Coleman that he had two options: either cooperate with her by verifying Cusimano's manufactured claims, his "rabbit" thesis, and other discrimination allegations against Plaintiffs as a witness in the class action complaint, or Dickens would sue Coleman. Coleman explained to Dickens that he never participated in any form of discrimination or hiring of "rabbits", nor had he witnessed any of the alleged discriminatory practices and to say otherwise would be a lie. Dickens then told Coleman that she was certain that he must know something that would help her and that if Coleman provided her with such information she would not sue him. Coleman re-explained to her that such acts were not something he would ever condone or participate in. Coleman asked Dickens for a couple days to think about it, because he did not want to be sued.

38. On March 21, 2014, Dickens again contacted Coleman in Texas via phone from Law Firm's office and again spoke to him in a threatening tone. Coleman repeatedly told Dickens that he had no knowledge of any discrimination at the District and no knowledge of any of her allegations against Plaintiffs. Dickens repeatedly told Coleman that, in order not to be

9

sued, Coleman needed to provide Dickens with information that is helpful to her and join their side in the litigation against Plaintiffs. Dickens told Coleman that, if he did not provide this information, she would consider him as not being on her side, and he would suffer the consequences.

## Count I – RICO Claim Against All Defendants

39. Defendants Law Firm, Dickens, and Johnston together constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4), in that Law Firm is legal entity that employs Dickens and Johnston.

40. In addition, beginning in December 2013 at the latest and continuing through at least the filing of this Complaint, Defendants and others known and unknown, including Cusimano and agents and employees of Defendants, have constituted an associated-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4).

41. The members of the Enterprise, including at least Defendants, have shared and continue to share a common purpose of exerting public pressure on Plaintiffs, on many different fronts and using many different methods, with the goal of forcing Plaintiffs to pay Defendants large amounts of money either in settlement to make the pressure stop or by way of wrongfully-obtained court judgments.

42. The Enterprise has existed since at least December 2013 and has continued to exist through the filing of this Complaint (at least five months), which has been long enough for the members of the Enterprise to pursue its purpose through a pattern of racketeering, a pattern that threatens to continue for many more months and possibly years.

43. Beginning in December 2013 at the latest and continuing through at least the filing of this Complaint, Defendants have conspired to conduct the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

44. Beginning in December 2013 at the latest and continuing through at least the filing of this Complaint, Defendants have conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

45. To date, Defendants have committed at least the following racketeering acts, as such acts are defined by 18 U.S.C. § 1961(1)(B), to advance the purposes of the Enterprise:

   a. Defendants' letter to Plaintiffs of December 10, 2013, as well as subsequent communications from Defendants to Plaintiffs during December 2013 through February 2014, described above, all constituted instances of attempted interference with interstate commerce, in violation of 18 U.S.C. § 1951, in that Defendants were attempting to obtain money from Plaintiffs, with Plaintiffs' consent, through the wrongful use of fear of economic harm.

   b. Dickens' false statements about Plaintiffs to news reporters on March 6, 2014, described above, constitute instances of wire fraud, in violation of 18 U.S.C. § 1343, in that Dickens made such statements as part of Defendants' intentional plan or scheme to defraud the public about Plaintiffs business reputation, with reasonable foreseeability that wire, radio, or television communication in interstate or foreign commerce would be used to transmit those false statements to the public, and the false statements were in fact transmitted via wire, radio, and television communications in interstate or foreign commerce.

11

    c. Dickens' efforts to influence the testimony of Andrew Coleman constitute instances of witness tampering, in violation of 18 U.S.C. § 1512, in that Dickens knowingly used intimidation, threatens, and/or corruptly attempted to persuade Coleman, all with the intent of influencing him to testify other than truthfully in connection with an ongoing federal lawsuit; these same efforts also constitute obstruction of justice, in violation of 18 U.S.C. § 1503, in that Dickens corruptly, through threatening communications, endeavored to influence, obstruct, or impede, the due administration of justice in an ongoing federal lawsuit.

46. These racketeering acts committed by Defendants constitute a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), in that Defendants have committed multiple racketeering acts over several months, all related to advancing the purposes of the Enterprise, and these multiple acts constitute an ongoing pattern that threatens to extend into the future.

47. Plaintiffs have been injured in their businesses by Defendants' violations of 18 U.S.C. § 1962(c) and (d), in that Defendants' pattern of racketeering activities, as described above, have damaged Plaintiffs' public reputation for business and forced Plaintiffs to pay their attorneys' fees to defend the baseless lawsuits brought by Defendants against Plaintiffs.

48. Accordingly, pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants threefold the damages Plaintiffs have sustained to their businesses as a result of Defendants' pattern of racketeering, as well as their costs and attorneys' fees incurred in bringing and prosecuting this suit.

WHEREFORE, Plaintiffs pray for judgment in their favor against Defendants Law Firm, Dickens, and Johnston on this Count I, for threefold Plaintiffs' actual damages, for Plaintiffs'

costs of this suit, for Plaintiffs' reasonable attorneys' fees herein, and for such other and further relief as the Court deems just and proper under the circumstances.

## Count II – Defamation Against Dickens

49. Dickens made false statements about Plaintiffs to news reporters on March 6, 2014, as detailed above, which tended to expose Plaintiffs to public hatred, contempt, or ridicule and/or deprive Plaintiffs of public confidence in their businesses.

50. Dickens made such statements either with knowledge that they were false or with reckless disregard to their truth or falsity.

51. Dickens made such statements with actual malice, in that she made such statements with the intent to injure Plaintiffs' reputations.

52. Dickens' false and defamatory statements to news reporters, as detailed above, resulted in harm to Plaintiffs' reputations.

53. Accordingly, Dickens is liable for the damage her false and defamatory statements, communicated to third parties, caused to Plaintiffs.

54. That the conduct of Defendants in making the false statements was willful and outrageous as such were made with evil motive or reckless indifference to the rights of Plaintiffs so as to justify the imposition of punitive damages to punish Defendants and deter such conduct in the future.

WHEREFORE, Plaintiffs pray for judgment in their favor against Defendant Dickens on this Count II, for Plaintiffs' actual damages, for punitive damages, for Plaintiffs' costs of this suit, and for such other and further relief as the Court deems just and proper under the circumstances.

## **Demand for Trial by Jury**

Plaintiffs demand trial by jury for all issues so triable herein.

Dated <u>May 6, 2014</u>            Respectfully submitted,

                                             **FOLAND, WICKENS, EISFELDER,**
                                             **ROPER & HOFER, P.C.**

                                             */s/ W. James Foland*

| | |
|---|---|
| JACQUELINE M. SEXTON | KS #: 19878 |
| W. JAMES FOLAND | KS #: 70116 |
| LUKE R. HERTENSTEIN | KS #: 23809 |

911 Main Street, Suite 3000
Kansas City, MO 64105
(816) 472-7474; (816) 472-6262 (Fax)
jsexton@fwpclaw.com; jfoland@fwpclaw.com
lhertenstein@fwpclaw.com

***ATTORNEYS FOR PLAINTIFFS***